**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| AGNES LAWSON, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Case No. 3:16-cv-2435 (BRM)(DEA) |
| | : | |
| PRAXAIR, INC., et al., | : | |
| | : | |
| Defendants. | : | **OPINION** |
| | : | |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is an appeal by Defendants and Third-Party Plaintiffs Praxair, Inc., Praxair Distribution, Inc. ("PDI") and Praxair Distribution Mid-Atlantic, LLC d/b/a GTS-Welco ("PDMA") (collectively, "Praxair") (ECF No. 344) of Magistrate Judge Douglas E. Arpert's July 28, 2020 Order (ECF No. 341) that affirmed in part and reversed in part the decision of the Special Master dated March 19, 2020 (ECF No. 300). University Medical Center of Princeton at Plainsboro ("UMCPP") opposed Praxair's appeal. (ECF No. 353.) Praxair filed a Reply. (ECF No. 358.) Having reviewed the parties' submissions filed in connection with the appeal and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, Praxair's appeal (ECF No. 344) is **DENIED** and Judge Arpert's Order (ECF No. 341) is **AFFIRMED**.

I.    **BACKGROUND**

This matter has been ongoing since March 2016. Accordingly, the Court will only address the procedural history associated with this appeal.

1

Plaintiff Agnes Lawson ("Lawson") brought this action against Praxair seeking damages for injuries sustained when a Praxair's Grab 'n Go Vantage oxygen tank ("GNG") exploded at University Medical Center of Princeton at Plainsboro ("UMCPP") where Lawson worked as a nurse ("the Lawson Incident"). (ECF No. 1 at ¶ 2; ECF No. 341 at 1.) Praxair filed a Third-Party Complaint against UMCPP for breach of contract and contractual indemnification based on a Product Supply Agreement ("PSA") between Praxair and UMCPP with respect to the distribution of oxygen cylinder products to UMCPP. (ECF No. 11.)

On September 23, 2019, Praxair requested the Special Master conduct an *in camera* review of the documents, which UMCPP claimed were privileged pursuant to the New Jersey Patient Safety Act ("NJPSA"), to determine whether the privilege was properly asserted. (ECF No. 225.) On November 5, 2019, the Special Master ordered UMCPP to produce the "disputed documents" withheld pursuant to the NJPSA for the *in camera* review. (ECF No. 252.) On November 19, 2019, UMCPP appealed to object to the Special Master's decision that all the documents withheld under the NJPSA must be submitted for review. (ECF No. 260.) On January 16, 2020, Judge Arpert affirmed the Special Master's decision. (ECF No. 283.) Judge Arpert also ordered the parties to meet and confer to attempt to minimize the number of documents for the Special Master to review, and to bear the cost of the *in camera* review in proportion to the ultimate findings of the Special Master. (*Id.* at 3–4.) Thereafter, UMCPP withdrew its privilege designation as to a number of documents. (ECF No. 341 at 3.) After an *in camera* review, on March 19, 2020, the Special Master found 2,009 pages of documents were protected by the NJPSA, and 33 pages should be produced. (ECF No. 300 at 2–3.) Accordingly, the Special Master ordered Praxair to bear 98% of the cost associated with the *in camera* review. (*Id.* at 4.)

On May 15, 2020, Praxair submitted an appeal of the Special Master's March 19, 2020 Order to Judge Arpert. (ECF No. 310.) Praxair argued the NJPSA did not apply, and UMCPP's withholding of certain key information affected Praxair's constitutional due process rights. (ECF No. 310-1.) On May 18, 2020, UMCPP submitted an appeal of the Special Master's March 19, 2020 Order to Judge Arpert, contending it should not be required to produce for the *in camera* review an email that contained a summary of an employee interview that was conducted for UMCPP's root cause analysis. (ECF No. 313.) On July 28, 2020, Judge Arpert denied Praxair's appeal and granted UMCPP's appeal. (ECF No. 341.)

On August 11, 2020, Praxair appealed from Judge Arpert's July 28, 2020 Order. (ECF No. 344.) On August 25, 2020, UMCPP opposed Praxair's appeal. (ECF No. 353.) On September 1, 2020, Praxair filed a Reply. (ECF No. 358.)

## II.   LEGAL STANDARD

With respect to a district judge's review of a magistrate judge's decision, Federal Rule of Civil Procedure 72(a) states: "The district judge . . . must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." *Id.* Similarly, this Court's Local Rules provide "[a]ny party may appeal from a Magistrate Judge's determination of a non-dispositive matter within 14 days" and the District Court "shall consider the appeal and/or cross-appeal and set aside any portion of the Magistrate Judge's order found to be clearly erroneous or contrary to law." L. Civ. R. 72.1(c)(1)(A).

A district judge may reverse a magistrate judge's order if the order is shown to be "clearly erroneous or contrary to law" on the record before the magistrate judge. 28 U.S.C. § 636(b)(1)(A) ("A judge of the court may reconsider any pretrial matter [properly referred to the magistrate judge] where it has been shown that the magistrate judge's order is clearly erroneous or contrary

to law."); Fed. R. Civ. P. 72(a); L. Civ. R. 72.1(c)(1)(A); *Haines v. Liggett Grp., Inc.*, 975 F.2d 81, 93 (3d Cir. 1992) (describing the district court as having a "clearly erroneous review function," permitted only to review the record that was before the magistrate judge). The burden of showing that a ruling is "clearly erroneous or contrary to law rests with the party filing the appeal." *Marks v. Struble*, 347 F. Supp. 2d 136, 149 (D.N.J. 2004). A district judge may find a magistrate judge's decision "clearly erroneous" when it is "left with the definite and firm conviction that a mistake has been committed." *Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co.*, 131 F.R.D. 63, 65 (D.N.J. 1990) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)); *accord Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 518 (D.N.J. 2008). However, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Waterman*, 755 F.3d 171, 174 (3d Cir. 2014) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). The magistrate judge's ruling is "contrary to law" if it misinterpreted or misapplied applicable law. *Kounelis*, 529 F. Supp. 2d at 518; *Gunter v. Ridgewood Energy Corp.*, 32 F. Supp. 2d 162, 164 (D.N.J. 1998).

## III.   DECISION

The Court begins with a brief introduction of the central point of this discovery dispute, *i.e.*, the NJPSA privilege. The NJPSA was enacted to encourage the disclosure of adverse events and near-misses that threaten the safety of patients in a health care facility, by creating "a non-punitive culture that focuses on improving processes rather than assigning blame." N.J. Stat. Ann. 26:2H-12.24(e). It "exists to promote thorough and candid discussions of events occurring in health care facilities, and thereby to protect the safety of patients." *C.A. ex rel. Applegrad v. Bentolila*, 99 A.3d 317, 331 (N.J. 2014). The NJPSA "establishes an absolute privilege for two categories of documents." *Conn v. Rebustillo*, 138 A.3d 545, 546 (N.J. Super. Ct. App. Div. 2016).

"N.J. Stat. Ann. 26:2H-12.25(f) (subsection (f) privilege) applies to the first category, which consists of documents received by the Department of Health (the "Department") pursuant to the mandatory reporting requirement, N.J. Stat. Ann. 26:2H-12.25(c) (subsection (c)) or the voluntary disclosure provision, N.J. Stat. Ann. 26:2H-12.25(e) (subsection (e))." *Id.* "N.J.S.A. 26:2H-12.25(g) provides a similar privilege (subsection (g) privilege) to a second category of documents, developed as part of a 'self-critical analysis' that might never be provided to the Department." *Id.* The subsection (g) privilege provides:

> Any documents, materials or information developed by a health care facility as part of a process of self-critical analysis conducted pursuant to subsection b.[1] of this section concerning preventable events, near-misses and adverse events, including serious preventable adverse events . . . shall not be: (1) subject to discovery or admissible as evidence or otherwise disclosed in any civil, criminal or administrative action or proceeding.

N.J. Stat. Ann. 26:2H-12.25(g). The NJPSA defines a "preventable event" as "an event that could have been anticipated and prepared against, but occurs because of an error or other system failure." N.J. Stat. Ann. 26:2H-12.25(a). A "near miss" is defined as "an occurrence that could have resulted in an adverse event but the adverse event was prevented." *Id.* An "adverse event" is defined as "an event that is a negative consequence of care that results in unintended injury or illness, which may or may not have been preventable." *Id.* N.J. Stat. Ann. 26:2H-12.25(b) requires:

> [A] patient safety plan include, "at a minimum," four components: the establishment of "a patient safety committee"; "a process for teams of facility staff . . . to conduct ongoing analysis and application of evidence-based patient safety practices" to reduce the risk of adverse events; "a process for teams of facility staff . . . to conduct analyses of near-misses"; and "a process for the provision of ongoing patient safety training for facility personnel."

*C.A. ex rel. Applegrad v. Bentolila*, 99 A.3d 317, 329 (2014) (citing N.J. Stat. Ann. 26:2H-

---

[1] Codified as N.J. Stat. Ann. 26:2H-12.25(b).

12.25(b)). N.J.A.C. 8:43E-10.9(b)(1) further clarifies certain procedural requirements that must be met to qualify for the subsection (g) privilege: the documents, materials, and information (including the root cause analyses and minutes of meetings), for which the NJPSA privilege is sought, must be developed exclusively during the process of self-critical analysis performed pursuant to one of the three specific processes, *i.e.*, (1) by a patient or resident safety committee under N.J.A.C. 8:43E-10.4, (2) by a patient or resident safety plan under N.J.A.C. 8:43E-10.5, or (3) reporting to regulators under N.J.A.C. 8:43E-10.6. *Id.* at 328–29; *Brugaletta v. Garcia*, 190 A.3d 419, 429–30 (N.J. 2018).

### A.   Praxair Waived the Argument That the NJPSA Does Not Apply Because Lawson Is Not a Patient

In the July 28, 2020 Order, Judge Arpert declined to entertain Praxair's argument—the NJPSA is inapplicable here as a matter of law, because Lawson was an employee of UMCPP when the Lawson Incident occurred, not a patient that the NJPSA was enacted to protect—since (1) Praxair did not timely raise the argument before the Special Master, and (2) should Judge Arpert accept the argument, it would render the entire dispute before the Special Master, UMCPP's de-designation effort, and the *in camera* review meaningless. (ECF No. 341 at 4–5.) Praxair disagrees, and claims to have raised the argument with the Special Master in its September 23, 2019 letter. (ECF No. 344-1 at 34.) Praxair states it initially requested an *in camera* review because it had no way of knowing what UMCPP was withholding. (*Id*. at 35.) After seeing UMCPP's categorization of its documents submitted for the *in camera* review, Praxair alleges to have responded in another letter dated February 3, 2020 to the Special Master raising the argument that the NJPSA was inapplicable because Lawson was not a patient. (*Id*.) Praxair maintains the *in camera* review would not be meaningless should Judge Arpert accept the argument, because the review helped resolve the issue of the NJPSA's applicability. (*Id*. at 36.) Praxair insists it has not waived the argument,

6

and there is no evidence that UMCPP would suffer any prejudice if had the argument been heard by Judge Arpert. (*Id*. at 37.) Praxair states the Special Master's March 19, 2020 Order specifically referenced Praxair's February 3, 2020 letter, and did not indicate the Special Master was not considering Praxair's "additional arguments" in the letter. (ECF No. 358 at 16.) Praxair emphasizes it has never conceded the NJPSA is applicable. (*Id*.)

UMCPP stresses Praxair did not raise the argument in Praxair's September 23, 2019 letter and October 21, 2019 reply letter brief. (ECF No. 353 at 16.) UMCPP points out Praxair specifically sought an *in camera* review to determine the applicability of the NJPSA privilege, thereby acknowledging certain documents may be protected by the privilege. (*Id*.) UMCPP also points out Praxair, in opposing UMCPP's motion appealing the Special Master's ordering of an *in camera* review, did not raise the argument. (*Id*.) UMCPP claims, when Praxair first raised the argument in the February 3, 2020 letter, briefing had closed on this dispute, the Special Master had ordered the *in camera* review which was affirmed by Judge Arpert, and UMCPP had engaged in the review of the documents withheld pursuant to the NJPSA and provided thousands of pages of documents for the *in camera* review. (*Id*.) UMCPP suggests it would be prejudiced had the argument been considered, because the costs expended for the *in camera* review would be rendered meaningless. (*Id*. at 17.) The Court agrees.

In the September 23, 2019 letter, Praxair did not raise the argument that the NJPSA was inapplicable because Lawson was not a patient. Instead, Praxair opposed UMCPP's invocation of the NJPSA privilege for two reasons: (1) UMCPP's root cause analysis concerning the Lawson Incident was not conducted by the Patient Safety Committee ("PSC"), and (2) the documents withheld by UMCPP might nevertheless be discoverable from another source or contain purely factual contents. (ECF No. 225 at 7–8.) At the end of the letter, Praxair requested an *in camera*

review to determine whether UMCPP could invoke the NJPSA privilege for the withheld documents. (*Id*. at 8.)

The Court finds Praxair could have argued in the September 23, 2019 letter the NJPSA was inapplicable because Lawson was not a patient. After all, more than three years ago before sending the letter, Praxair stated Lawson was an employee of UMCPP. (ECF No. 11 at ¶ 4.) In other words, upon UMCPP's invocation of the NJPSA privilege, Praxair voluntarily chose not to address the issue that Lawson was not a patient, when it had an opportunity to do so before the Special Master, who is authorized to "make decisions and written orders concerning any discovery conflicts." (ECF No. 199 at ¶ 1.) Therefore, Judge Arpert did not clearly err in declining to consider Praxair's argument because it was not timely presented to the Special Master. *See Arconic Inc. v. Novelis Inc.*, No. 17-1434, 2019 U.S. Dist. LEXIS 195213, at \*14–15 (W.D. Pa. Sept. 6, 2019) (finding the plaintiff "has waived any objection to [the defendant's] proposals of what it will produce in response to [the plaintiff's] 22 document requests," because the plaintiff "failed to argue why [the defendant's] proposed response was insufficient" when the plaintiff "had an opportunity" to do so); *Tex. v. United States*, 49 F. Supp. 3d 27, 31 (D.D.C. 2014) ("[T]he failure to respond to an opposing party's arguments results in waiver as to the unaddressed contentions."); *Duran v. Equifirst Corp.*, No. 2:09-cv-03856, 2010 U.S. Dist. LEXIS 22904, at \*7 (D.N.J. March 12, 2010) ("The absence of argument constitutes waiver in regard to the issue left unaddressed.").

### B.      Judge Arpert Did Not Erroneously Expand the Application of the NJPSA

Notwithstanding the waiver, Judge Arpert rejected Praxair's argument that the NJPSA was inapplicable because Lawson was not a patient, after examining the NJPSA's plain language. (ECF No. 341 at 5.) Judge Arpert found the Lawson Incident was the type of "near-miss" contemplated by the NJPSA, and could have resulted in a serious injury to patients. (*Id*. at 6.) Praxair disagrees,

arguing the NJPSA does not apply in this product liability case that does not involve a claim by an injured patient, because the NJPSA, on its face, and based on its legislative history, was enacted to enhance patient safety and craft a health care delivery system that minimizes the harm to patients resulting from the delivery system itself. (ECF No. 344-1 at 16.) Praxair suggests, since Lawson was not a patient when the incident happened, the NJPSA should not apply. (*Id.*) Praxair also contends Judge Arpert's finding that the Lawson Incident was a "near-miss" of adverse events to patients, thereby triggering the NJPSA, is contrary to law, because (1) the determination on the occurrence of a "near-miss" is within the province of the Department and not the courts (*id.* at 18–19 (citing *Brugaletta v. Garcia*, 190 A.3d 419 (N.J. 2018))), (2) Judge Arpert's finding that the Lawson Incident was a "near-miss" was not supported by any competent evidence (*id.* at 17–18), and (3) Judge Arpert failed to examine the NJPSA's language and legislative history, and the fact that no prior case has expanded the NJPSA privilege beyond the medical malpractice context (*id.* at 20–23). UMCPP claims Judge Arpert correctly found the NJPSA applied here, because the Lawson Incident was a "near-miss" covered by the NJPSA that could have resulted in a serious injury to patients and personnel in the hospital. (ECF No. 353 at 20.) UMCPP emphasizes Judge Arpert has recognized the GNG is a medical device used for patient care and it exploded in a patient room. (*Id.*) UMCPP maintains a court need not rely on the Department's determination as to whether a "near miss" occurred in making a privilege determination. (*Id.* at 24.) The Court agrees.

"[T]he finding of a SPAE[2]" is not necessary to invoke the NJPSA privilege. *Brugaletta*, 190 A.3d at 432. "[T]he only precondition to application of the [NJ]PSA's privilege is whether the

---

[2] SPAE stands for "serious preventable adverse event."

hospital performed its self-critical analysis in procedural compliance with N.J.S.A. 26:2H-12.25(b) and its implementing regulations." *Id*; *see also C.A. ex rel. Applegrad v. Bentolila*, 99 A.3d 317, 329 (N.J. 2014) ("The NJPSA focuses upon the process that generated the communication for which a health care facility claims privilege."). "[T]he Legislature's protective privilege around the process of performing a self-critical analysis is broad, provided procedural compliance is present." *Brugaletta*, 190 A.3d at 432. "[T]he conclusion reached" by the self-critical analysis as to the type of event occurred does not determine the "[a]pplication of the privilege to the documents developed through self-critical analysis." *Id*. at 433. Therefore, the Court need not make a factual finding of a near-miss in determining the applicability of the NJPSA privilege, as only UMCPP's procedural compliance with the NJPSA[3] matters.

Since only procedural compliance determines the applicability of the NJPSA privilege, whether a patient has been injured is not dispositive either. Moreover, the plain language of the NJPSA does not require a patient's injury to be established before invoking the privilege. For example, the NJPSA provides a self-critical analysis is initiated when "a health care facility or one of its employees *suspects* that a SPAE has occurred, and the [PSC] is so informed." *Trella v. Bradish*, No. A-3039-18T3, 2019 N.J. Super. Unpub. LEXIS 2067, at *3 (N.J. Super. Ct. App. Div. Oct. 8, 2019) (citations omitted); *see also Brugaletta*, 190 A.3d at 429 ("When a health care facility or an employee thereof *suspects* that a SPAE may have occurred . . . the patient safety committee must . . . perform a 'root cause analysis' to identify the causes of a SPAE and appropriate corrective action."). SPAE "means an adverse event that is a preventable event and results in death or loss of a body part, or disability or loss of bodily function lasting more than seven days or still present at the time of discharge from a health care facility." N.J.A.C. 8:43E-

---

[3] UMCPP's procedural compliance will be discussed in Part III.C, *infra*.

10.3. An "adverse event," as mentioned in the definition of SPAE, is defined as "an event that is a negative consequence of care that results in unintended injury or illness, which may or may not have been preventable." N.J. Stat. Ann. 26:2H-12.25(a). That is to say, SPAE—not to mention a *suspected* SPAE—by definition does not necessarily involve a patient. Therefore, a procedurally compliant self-critical analysis triggered by a (suspected) SPAE, which may or may not involve a patient, will invoke the NJPSA privilege.

The Court need not consider the NJPSA's legislative history here, as the relevant provisions of the NJPSA are not ambiguous. *State v. Fuqua*, 192 A.3d 961, 965 (N.J. 2018) ("We only resort to extrinsic evidence, such as legislative history and committee reports, in the event that the statutory language at issue is ambiguous.") (citations omitted). Accordingly, Judge Arpert's rejection of Praxair's argument—the NJPSA is inapplicable because Lawson was not a patient when the Lawson Incident occurred—is not contrary to law. The Court does not find Judge Arpert erroneously expanded the application of the NJPSA.

### C.    Judge Arpert Did Not Clearly Erred in Finding UMCPP Satisfied the Regulatory Requirements of the NJPSA

Noting Praxair did not ask the Court to conduct a second *in camera* review, Judge Arpert declined to overturn the Special Master's conclusion that 98% of the documents reviewed were protected under the NJPSA. (ECF No. 341 at 7.) Praxair contends neither Judge Arpert nor the Special Master provided any analysis as to how UMCPP met the regulatory requirements under the NJPSA to invoke the privilege. (ECF No. 344-1 at 29–30.) Praxair states UMCPP failed to prove the "documents relating to UMCPP's investigation and root cause analysis into the Lawson Incident, conducted by UMCPP's Patient Safety Committee, were exclusively prepared in the setting of a qualifying self-critical analysis process and in accordance with UMCPP's Patient Safety Plan and N.J.A.C. 8:43E-10.4, -10.5." (*Id*. at 33.) UMCPP maintains the Special Master

was in the best position to confirm UMCPP's compliance with the statutory and regulatory framework under the NJPSA by reviewing the documents. (ECF No. 353 at 27.) UMCPP states Praxair has no reason to overturn the Special Master's decision. (*Id.*) The Court agrees and will address each of Praxair's alleged bases to overturn the Special Master's decision.

First, Praxair points out UMCPP's root cause analysis was performed by select members of the PSC, thereby failing to comply with N.J.A.C. 8:43E-10.4(c), which prohibits the PSC from acting as a subcommittee and requires the PSC consist of certain individuals. (ECF No. 344-1 at 30.) The Court disagrees, because Praxair fails to allege a violation of N.J.A.C. 8:43E-10.4(c). N.J.A.C. 8:43E-10.4(c)(4) provides "[t]he patient or resident safety committee shall not constitute a subcommittee of any other committee within a facility or health care system." N.J.A.C. 8:43E-10.4(c)(4). In addition, N.J.A.C. 8:43E-10.4(c)(1)–(3) lays out several requirements on the PSC's composition. But even if select members of UMCPP's PSC performed the root cause analysis, it does not render the PSC or its select members a subcommittee of another committee in violation of N.J.A.C. 8:43E-10.4(c)(4), or in any way indicate the PSC's composition that may violate N.J.A.C. 8:43E-10.4(c)(1)–(3).

Second, Praxair claims UMCPP has only identified the Senior Executive Members of the PSC, without specifying their roles, during the relevant time period. (ECF No. 344-1 at 30.) But the Court does not discern, and Praxair does not present, any legal authority requiring the party invoking the NJPSA privilege to identify all the PSC members and their roles.

Third, Praxair alleges Dann Dingle ("Dingle"), UMCPP's Safety Officer, conceded in his deposition UMCPP's root cause analysis was conducted by the Executive Patient Safety Steering Committee, not the PSC, thereby violating N.J. Stat. Ann. 26:2H-12.25(b) and N.J.A.C. 8:43E-10.4. (*Id.* at 31.) The Court disagrees. The relevant portions of Dingle's deposition are as follows:

Q. Sorry. What was the name of the group that conducted the root cause analysis that your testimony covered?

. . .

[A.] I didn't give that group a name. It was a group of individuals I had given you.

. . .

Q. Was there a name for that group of individuals?

A. There was eventually a group called the Executive Patient Safety Steering Committee.

Q. Was there even a group of individuals referred to as the "Patient Safety Committee" at the hospital, to your knowledge?

. . .

[A.] Yes.

. . .

Q. . . . [W]as there a name of [] the entity that conducted the root cause analysis? Is there a committee name of an ad hoc name or something like that?

[A.] I don't know.

(ECF No. 226-2 at 25, 27.) The Court finds Dingle's deposition does not support Praxair's allegation. First, Dingle was unclear as to the very entity that conducted the root cause analysis. Second, even if the Executive Patient Safety Steering Committee was involved in the root cause analysis, it does not necessarily negate PSC's participation (possibly in a leading role) in the process. Instead, UMCPP indicates the root cause analysis was conducted by Sharon Moon and Pamela Bradly, who are both members of the PSC. (ECF No. 353 at 26 n.12.) Third, Praxair has not clarified the nature of the Executive Patient Safety Steering Committee and its relationship with the PSC—could the Executive Patient Safety Steering Committee be guided by or a part of the PSC? If the Executive Patient Safety Steering Committee worked for or with the PSC in conducting the root cause analysis—a possibility that Dingle's deposition cannot rule out—the NJPSA privilege may still apply. N.J.A.C. 8:43E-10.9(c) (providing the NJPSA privilege "shall also apply to any person who performs responsibilities for or participates in meetings of the patient or resident safety committee"). Therefore, it is not clearly erroneous for the Special Master to find the PSC performed the root cause analysis. *See United States v. Waterman*, 755 F.3d 171, 174 (3d

13

Cir. 2014) (citations omitted) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

Fourth, Praxair contends UMCPP brought outside consultants in to assist with its root cause analysis, thereby precluding the application of the NJPSA privilege, which applies only to the documents prepared exclusively by the PSC during a self-critical analysis. (ECF No. 344-1 at 31.) But the Court does not discern, and Praxair does not present, any legal authority stating the NJPSA privilege applies only to the documents prepared exclusively by the members of the PSC. On the contrary, the NJPSA privilege "shall also apply to any person who performs responsibilities for or participates in meetings of the patient or resident safety committee." N.J.A.C. 8:43E-10.9(c). In other words, if the alleged outside consultants worked for or with the PSC in conducting the root cause analysis—a possibility that Praxair fails to rule out—the NJPSA privilege may still apply.

Finally, Praxair cites *Ungurian* to argue UMCPP failed to satisfy its burden of demonstrating it properly invoked the NJPSA privilege, and Judge Arpert's finding concerning UMCPP's compliance with the NJPSA was without any evidentiary reference. (ECF No. 344-1 at 32-33 (citing *Ungurian v. Beyzman*, 232 A.3d 786 (Pa. Super. 2020)).) The Court disagrees. *Ungurian* is a Pennsylvania case that does not involve the NJPSA, and therefore does not bind this Court. Also, different standards of proof may be applicable in invoking different types of evidentiary privileges. *See, e.g.*, *Knaupf v. Unite Here Local 100*, No. 14-6915, 2015 U.S. Dist. LEXIS 157710, at *14 (D.N.J. Nov. 23, 2015) ("[T]he party claiming a First Amendment privilege in an objection to a discovery request bears the burden to make a prima facie showing of the privilege's applicability.") (citations omitted); *United States v. Menendez*, 132 F. Supp. 3d 610, 621 (D.N.J. 2015) ("A party asserting a legislative privilege . . . bears the burden of establishing the applicability of legislative immunity by a preponderance of the evidence.") (citations omitted);

*In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 799 n.15 (E.D. La. 2007) (placing "the burden of establishing each element of the [attorney-client] privilege by a preponderance of the evidence on the proponent"). Here, the Court does not discern, and Praxair does not present, any binding legal authority that indicates the standard of proof for invoking the NJPSA privilege. As a result, the Court is unable to conclude Judge Arpert's finding on UMCPP's compliance with the NJPSA, even if in conflict with *Ungurian*, is necessarily contrary to law.

In conclusion, the Court does not find Judge Arpert's decision regarding UMCPP's compliance with the NJPSA was clearly erroneous or contrary to law.

### D.     Judge Arpert's Determination That Praxair's Due Process Right Is Not Violated Is Not Clearly Erroneous or Contrary to Law

Judge Arpert found no unfairness or due process violation in applying the NJPSA privilege. (ECF No. 341 at 8.) Praxair contends allowing UMCPP to withhold thousands of pages of documents with an inapplicable privilege deprives Praxair of the access to the most basic facts and violates Praxair's constitutional due process rights. (ECF No. 344-1 at 23.) Praxair insists it is entitled to know all of the information in UMCPP's possession regarding the cause of the Lawson Incident and the steps UMCPP took following the incident. (*Id*. at 24.) Praxair disagrees with Judge Arpert's determination—because UMCPP answered discovery and agreed to make witnesses available for depositions it has not violated Praxair's constitutional due process rights—and maintains the determination was not supported by evidence in the record but based on the legal arguments made by UMCPP's counsel. (*Id*.) Praxair provided the testimony of UMCPP's key witnesses who allegedly lacked any knowledge related to the basic facts, such as how the GNG came into the room where the Lawson Incident occurred. (*Id*.) Praxair argues the NJPSA privilege does not apply to the documents withheld by UMCPP and the raw factual information therein, which are necessary for Praxair's ability to make a defense and prove its third-party claims against

15

UMCPP. (*Id*. at 26.) Praxair suggests it is entitled to a written narrative of documents withheld pursuant to the NJPSA. (*Id*. at 27.)

UMCPP maintains there is no constitutional exception for the release of materials subject to the NJPSA privilege. (ECF No. 353 at 28.) UMCPP points out Praxair has access to the information concerning the factual circumstances of the Lawson Incident through other sources, including the investigative file of the Middlesex County Prosecutor's Office, OSHA and Plainsboro Fire Department files, and the interrogatories, documents, and deposition witnesses that UMCPP already produced and will produce. (*Id*. at 28–29.) UMCPP argues the scope of discovery that Praxair is requesting is disproportionate to Praxair's needs. (*Id*. at 29.) UMCPP states the information about UMCPP's root cause analysis—conducted after the Lawson Incident—is not relevant to Praxair's third-party claims, which are contractual claims based on a PSA that focuses on UMCPP's conducts prior to the Lawson Incident. (*Id*. at 30.) UMCPP insists any factual information, including a written narrative, developed as part of UMCPP's root cause analysis is privileged under the NJPSA and not subject to disclosure. (*Id*. at 25.) The Court agrees.

The NJPSA privilege applies to any "information developed by a health care facility as part of a process of self-critical analysis," N.J. Stat. Ann. 26:2H-12.25(g), including "a redacted document prepared internally by hospital personnel during the process of self-critical analysis." *Brugaletta v. Garcia*, 190 A.3d 419, 421–22 (N.J. 2018). But a court may allow the discovery of "information that would otherwise be discoverable or admissible," and may "compel a party producing documentary records to provide, with the records, a narrative that specifies for the requesting party where responsive information may be found." *Id*. at 430, 437. In other words, the narrative that is discoverable here only involves the information in the documents already produced, not the information in the privileged documents. This narrative does not provide a way

to circumvent the NJPSA privilege. Therefore, under the NJPSA, Praxair is not entitled to any factual information (including a narrative thereof) or redacted documents developed exclusively out of UMCPP's root cause analysis.

As for the due process issue, depriving a party "of the opportunity to obtain the necessary factual evidence" may "effectively block[] all procedural access for [the party] to put her case before the court," thereby violating her due process rights. *In re Complaint of Bankers Trust Co.*, 752 F.2d 874, 886–87 (3d Cir. 1984). Here, Praxair has not shown applying the NJPSA privilege will deprive it of the information essential to present its defenses and claims. UMCPP has made and will continue to make factual disclosures regarding the Lawson Incident. (ECF No. 353 at 28–29.) Praxair complains the two witnesses already produced by UMCPP lack any knowledge of certain basic facts (ECF No. 344-1 at 24), but UMCPP will produce additional witnesses for Praxair to depose (ECF No. 353 at 29), and these additional witnesses and other available sources may provide Praxair with the basic facts it claims to lack. In other words, Praxair has not demonstrated UMCPP's self-critical analysis would be the only possible source from which Praxair could learn any basic facts essential to its defense and third-party claims.

In conclusion, Judge Arpert's determination that Praxair's due process right is not violated is not clearly erroneous or contrary to law.

### E.     The Court Declines to Overturn the Cost Allocation Affirmed By Judge Arpert

Praxair contends, even if the Court finds the NJPSA privilege applies, which the Court does in Part III.C, *supra*, UMCPP should bear the cost of the *in camera* review based on its inequitable conduct, *i.e.*, the sudden removal of the privilege designation of 2,126 pages in less than two weeks after UMCPP learned it would have to pay for any documents the Special Master concluded were privileged. (ECF No. 344-1 at 37.) Praxair maintains UMCPP should be held

accountable for this inequitable conduct in deceptively keeping thousands of pages of non-privileged documents from Praxair for three years. (*Id.*) Praxair claims, when UMCPP actually produced the documents it previously withheld based on the NJPSA, it was clear there had been no good faith basis to withhold most, if not all of them, from discovery. (ECF No. 358 at 16.) UMCPP states its withdrawal of privilege designation as to a number of documents was consistent with the intent of Judge Arpert's January 16, 2020 Order that the parties meet and confer to minimize the number of documents to be reviewed. (ECF No. 353 at 21.) UMCPP claims Praxair failed to undertake good faith efforts to avoid the costs associated with the review, by (1) only agreeing to remove 21 duplicate documents from the review, (2) rejecting UMCPP's offer to permit Praxair to review the agendas for combined meeting materials, which would have shown these documents contained privileged and unresponsive information, and (3) insisting all documents withheld pursuant to the NJPSA be subject to the *in camera* review. (*Id.*) The Court discerns no basis to overturn Judge Arpert's decision on cost allocation.

The standard of review applicable to a magistrate judge's ruling on attorney's fees and costs is abuse of discretion. *Skretvedt v. E.I. DuPont de Nemours*, 98 F. App'x. 99, 102 (3d Cir. 2004) (citing *Silberman v. Bogle*, 683 F.2d 62, 64–65 (3d Cir. 1982)). "Under the 'clearly erroneous' standard, . . . in the absence of clearly defined parameters, a Magistrate has wide discretion to make interstitial rulings of law in the interests of justice and fairness, provided that the Magistrate's opinion is based on clearly articulated principles." *Schroeder v. Boeing Commercial Airplane Co.*, 123 F.R.D. 166, 169 (D.N.J. 1988) (affirming the magistrate judge's imposition on a party of reasonable fees incurred for several expert depositions); *see also Callas v. Callas*, No. 14-7486, 2019 U.S. Dist. LEXIS 17882, at *5 (D.N.J. Feb. 4, 2019) (citations and internal quotations omitted) ("An abuse of discretion occurs when the judicial action is arbitrary,

fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court.").

In the January 16, 2020 Order, Judge Arpert decided each party would bear the cost of the review in proportion to the percentage of materials deemed improperly withheld, where the relevant percentage would be page-based: the total number of pages comprising the documents deemed improperly withheld as compared to the total number of pages reviewed. (ECF No. 283 at 3–4.) As a result, after finding 98% of the pages reviewed were protected by the NJPSA, the Special Master ordered Praxair to bear 98% of the cost associated with the *in camera* review. (ECF No. 300 at 3–4.) Judge Arpert affirmed the cost allocation determined by the Special Master. (ECF No. 341 at 8.) Therefore, the Court finds Judge Arpert acted within his discretion in affirming the cost allocation, which is reasonable and in accordance with a clear principle articulated in the January 16, 2020 Order.

Moreover, to decide whether UMCPP had previously improperly withheld the 2,126 pages of documents it de-designated after the January 16, 2020 Order, the Court would have to undertake another round of *in camera* review of these documents. But the Court need not and, for the sake of judicial economy, should not undertake such a time-consuming endeavor, when no one claims these documents are privileged. If Praxair is correct to conclude, after merely examining the documents' titles, that UMCPP had no good faith basis under the NJPSA to withhold most of the 2,126 pages of documents (ECF No. 344-1 at 13), then Praxair could have reviewed the agendas for UMCPP's combined meeting materials—similar to the documents' titles in potentially providing a summary of the underlying contents—to decide whether an *in camera* review was necessary for at least some of the materials. Instead, Praxair rejected the UMCPP's invitation to review the agendas, and only removed 50 pages of duplicate documents out of over 2000 pages

from the *in camera* review. (*Id*. at 10 n.1.) Therefore, the Court finds the cost allocation affirmed by Judge Arpert is not against the interests of justice and fairness.

In conclusion, the Court declines to overturn the cost allocation affirmed by Judge Arpert.

## IV.    CONCLUSION

For the reasons set forth above, Praxair's appeal is **DENIED** and Judge Arpert's July 28, 2020 Order is **AFFIRMED**.

Date: March 30, 2021                    */s/ Brian R. Martinotti*
                                        HON. BRIAN R. MARTINOTTI
                                        UNITED STATES DISTRICT JUDGE